**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John Philip CERONE, Sr., et al., Defendants-Appellants.**

**Nos. 18551, 18555, 18622 and 18635.**

United States Court of Appeals, Seventh Circuit.

Sept. 15, 1971.

Rehearings Denied in Nos. 18551 and 18555 Oct. 26, 1971.

Rehearings Denied in Nos. 18622 and 18635 Nov. 9, 1971.

Certiorari Denied Feb. 28, 1972. See 92 S.Ct. 1169.

Julius Lucius Echeles, Chicago, Ill., for James Cerone.

Harry J. Busch, Jack P. Cerone, Chicago, Ill., for John Philip Cerone, Sr.

Louis Carbonaro, Carbonaro & Carbonaro, Chicago, Ill., for Joseph Ferriola.

John Powers Crowley, Chicago, Ill., for Dominic Cortina.

Anna R. Lavin, Edward J. Calihan, Jr., Chicago, Ill., for Donald J. Angelini.

William J. Bauer, U. S. Atty., Jeffrey Cole, Deputy Chief, Appellate Division, Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Michael D. Marrs, Donald C. Shine, Thomas G. Dent, Robert A. Filpi, Asst. U. S. Attys., of counsel.

Before SWYGERT, Chief Judge, and STEVENS and SPRECHER, Circuit Judges.

SWYGERT, Chief Judge.

These consolidated appeals challenge the validity of judgments of conviction entered upon jury verdicts which found defendants John P. (Jack) Cerone, Sr., Donald J. Angelini, Dominic Cortina, James Cerone and Joseph Ferriola guilty of conspiring to violate 18 U.S.C. § 1952 in violation of 18 U.S.C. § 371 and which found Angelini guilty of a substantive violation of section 1952 as well. Because the defendants each challenge, inter alia, the sufficiency of the evidence to support their convictions, we shall recite the facts adduced at trial in some detail, viewing the evidence in the light most favorable to the Government as we must.

The major source of the Government's evidence against the defendants was Lou-

is Bombacino, a paid informer who had been involved in the operation of defendants' alleged gambling conspiracy from late June of 1965 until about August of 1967.[1] Bombacino had been a rather unsuccessful criminal for much of his life, alternately attempting mail theft, forgery, robbery, extortion and the confidence game to support himself between the several prison terms he received for his endeavors. In April of 1965 while he was in jail awaiting trial on a state charge of robbery, Bombacino agreed to become an informer. Most of what follows is based upon his testimony.

Prior to the disposition of the robbery charge in September of 1965 (when he was placed on probation for a period of five years) but subsequent to his agreement to become an informer, Bombacino contacted Angelo Kokas, an old friend, on June 25, 1965, and, pursuant to their conversation on that date, returned to the MGM Lounge in Chicago at about midnight on the following day. When he arrived, Kokas, Frank Aureli (a defendant as to whom a mistrial and severance were ordered because of his sudden illness during the trial), defendant Ferriola, "Turk" Turello and John Varlas were seated together at a table in the restaurant portion of the Lounge. Bombacino went to the table and shook hands with Aureli, who inquired as to whether Bombacino was "going to give up getting [himself] in trouble all the time, back and forth, in and out of jails." Bombacino replied that was the reason he wanted to see Aureli, that he wanted to go to work for him. Aureli then looked at Ferriola, who nodded and told Bombacino: "You go to work for Frank [Aureli], but be careful. There are a lot of G heat on the street."[2]

In accordance with the foregoing conversation, Bombacino went to work for Aureli as an employee of the bookmaking operation conducted out of Aureli's apartment at 4355 South Sawyer. Bombacino's and Aureli's daily activities were essentially the same each day at the Sawyer street address, except that on Monday mornings Bombacino would go to Johnny Manzella's sausage stand to pick up baseball betting sheets which showed the teams scheduled to play for the week with various columnar rulings which were used to record the pitchers for each team and the "line," that is, odds and point spreads on each game. Except for that Monday variation, each day Bombacino would go to 4355 South Sawyer at about 10 or 11 a. m. The line would be obtained by a telephone call placed by Aureli, and he and Bombacino would then remain at the apartment taking calls from bettors and recording bets until about 4 to 6 p. m. The total of the day's bets taken in by Aureli and Bombacino on June 27, 1965, Bombacino's first day on the job, was about $15,000, the record of which was turned over that evening to Johnny Manzella who was identified as "the boss of the district."

About July 2, Aureli told Bombacino that Angelo Kokas was pocketing some of the bets he received and that they were going to Domenick's Pool Room. When they arrived at the poolroom at about 1 p. m., defendant Angelini, Kokas, Manzella and Joe Giancanna were already there. The group went into the poolroom section of the establishment (it also had a barber shop and candy counter) where Angelini told Kokas he was to call in all bets of $50 or more to Aureli. Kokas acquiesced without protest, and Aureli then gave Kokas a telephone number, whereupon Aureli and Bombacino departed.

About the middle of October, 1965, Aureli told Bombacino that they would be moving to Maywood, that they would be working for defendants Angelini and Cortina, and that Bombacino would no longer pick up schedules from Manzella. A day or two later, Bombacino and Aureli did move to 321 West Lake Street

---

1. Bombacino received slightly in excess of $3000 over the period of 45 months or so during which he served as an informer for the Federal Bureau of Investigation.

2. Bombacino testified that "G heat" meant agents of the Federal Bureau of Investigation.

in Maywood. The location was described as a small store with a barricaded back door, equipped with two telephones and two buckets of water.[3] Bombacino and Aureli operated in the same fashion as before, except that on Monday mornings Bombacino would pick up schedules from the office of Angel-Kaplan Sports News Service (wholly owned by Angelini) at 236 North Clark Street in Chicago and he also drove Aureli to and from the Lake Street location each day. In addition, Bombacino began to make the daily telephone calls to Angelini's office to obtain the line. Sometimes he spoke to Angelini personally in that regard. While at the Lake Street location, Aureli introduced Bombacino to John DiDomenico whom he identified as the bookkeeper for defendants Cortina and Angelini. DiDomenico picked up the betting records from Aureli and Bombacino on a daily basis, and on Sundays he "hung around" the Lake Street book and took bets over the telephone.

Three or four weeks after the move to Lake Street, Aureli and Bombacino moved again to a new location at 6955 West Grand Avenue shortly after Aureli informed Bombacino that they would so move. The characteristics of the new site and its equipment were essentially the same as at the former location. A day or so after the move, Aureli introduced Salvatore (Sammy) Molose to Bombacino at the book, stating that Molose was a good friend of Cortina's and that Aureli was going to teach him "the business." Bombacino's duties remained the same, however.

On January 7, 1966, the date another bookmaker named Andy Federenko was arrested, Aureli told Bombacino that they were going to the MGM Lounge to meet with Ferriola. They met Ferriola and Turello at the Lounge at about 7:30 p. m. Turello inquired of Aureli whether he knew anything about Federenko running an unauthorized book with Edward Bisacky that was taking in $50,000 per month. Aureli denied any such knowledge, and Ferriola instructed him to contact Federenko and determine whether he knew of any such book. The next evening Aureli told Bombacino that they were going to meet Federenko at the Division Street Bath House. They did so, and, in a conversation in the steam room, Federenko denied knowledge of the book. Aureli expressed disbelief and stated to Federenko that he would have to answer to Ferriola since he had told Aureli to inquire of Federenko about the book. On January 10, Bombacino, Aureli, Manzella, Federenko and Ferriola met at a sausage stand, and Ferriola ordered Manzella to get Manzella's betting records for Ferriola's inspection. Ferriola further ordered Federenko to take no more bets and to turn over all his bets to Aureli.

Early in February, 1966, Aureli told Bombacino that the betting was getting too heavy so that the bettors could not get through to him on the telephone and that Cortina was looking for a new telephone. Bombacino offered to use his home telephone for receiving bets. Aureli said he would let Bombacino know as to whether that was acceptable, and within a day or two Aureli told him that he should get a telephone and that he "would be taking all out-of-town sports action at [his] home." Bombacino had a telephone installed at his apartment at 2540 North Mannheim Road and began booking at his apartment. His duties remained the same—Mondays only, pick up schedules from Angelini's office; daily transport Aureli from his apartment to his book at 6955 West Grand; daily get the line from Angelini's office; daily

3. A day or two before the move to the 321 West Lake Street address, Aureli told Bombacino that they would be using dissolvable paper and that he would be picking up such paper at Jack Garber's printing shop. Garber testified that he had printed columnar and horizontal lines on such paper for Aureli as early as about June of 1965. With bets being placed over the telephone without money changing hands at the time of the placement of a bet, it is not difficult to understand the purpose of buckets of water at a bookmaking site where dissolvable paper was used.

take bets over the telephone from about 11 a. m. to about 6 p. m.; and daily turn in betting records to DiDomenico in the evening. Bombacino received almost daily telephone calls from Nate Wigod, a "big bettor from Detroit."

Near the end of April, 1966, Aureli went to Miami, Florida for a week to ten days. During that period, he called Bombacino in Illinois every evening to inquire how the book had fared for the day.

During May or June, 1966, on the occasion of his taking some money to Angelini for Aureli, Bombacino had a conversation with Angelini in the latter's office. When Bombacino inquired as to how Angelini was doing, Angelini replied that he "didn't like baseball because it looks like [Angelini] was losing another $200,000 this year on baseball."

In the early part of June, 1966, Aureli told Bombacino that Aureli was going to move his book from 6955 West Grand to 6949 West Grand. Aureli stated that Molose would be working at home and that Bombacino would continue to take the out-of-town bets at his apartment.

Toward the end of July, Aureli was arrested for gambling at his book which had been moved from 6955 West Grand to 6949 West Grand. That evening, Aureli called Bombacino and, after some discussion, Aureli stated that the reason for the delay in getting out of jail was that Cortina "had a hard time getting hold of the attorneys." The following day, Aureli and Bombacino met Cortina at Meincher's Restaurant. At that time Cortina stated, "We are going to give Frank Aureli a vacation at this time because he had already a couple of arrests for gambling and just got busted again; therefore, Sammy Molose will take the local sports action at his house, [Bombacino] will take the out-of-town action at [his] house, and [I'll] take the rest of the action at [my] place."

The evening of December 7, 1966, Bombacino was visited by Cortina and Aureli at Bombacino's apartment. Cortina told Bombacino that Molose had been arrested and that he was concerned that police might have found Bombacino's telephone numbers in Molose's home or in his possession. Cortina then suggested that Bombacino change his telephone numbers which he did. Aureli continued to pay Bombacino's telephone bills.

On December 27, 1966, Bombacino was called by a man who identified himself as "Lefty." Pursuant to that conversation, Bombacino went the next day to Meo's Norwood House Restaurant at about noon. He was directed by the maitre d' to the back of the dining room where he recognized defendant Jack Cerone seated at a table with Paul DeLucia. Cerone said to Bombacino that he had been hearing nothing but favorable reports about Bombacino and that he had something in mind for him, but that he first had to talk to someone later on that day. He asked if Bombacino could meet him the next day at a bar called "The Leather Bottle" at 4 p. m., to which Bombacino replied he would. Cerone also stated to DeLucia that DeLucia knew Bombacino because Bombacino's brother used to make dietetic pastries for DeLucia. When Bombacino returned to his apartment, he called Aureli and told him of the conversation with Jack Cerone. Aureli replied, "Good. You're really getting up there."

The following day, Bombacino went to The Leather Bottle at the appointed time. He had a drink as he waited, and a few minutes after he arrived, a man who identified himself as "Lefty" came in and spoke to Bombacino. Bombacino then left The Leather Bottle and crossed the street, entering Armand's Pizzeria. There he saw Jack Cerone seated alone at a table in the back. Lefty went towards the bar in Armand's, leaving Cerone and Bombacino. Cerone told Bombacino he wanted him to service some big bettors in addition to those he had and that he wanted Bombacino to meet someone who would be in momentarily. A few minutes later, James Cerone came in. Jack Cerone began to introduce Bombacino to James, but James stated, "I know Lou for a long time." James Cerone sat down and told Bombacino that bettors

would call him and identify themselves as "Goldblatt" with some initials which would enable James to identify them. Jack Cerone then placed a telephone call within the hearing range of those at the table and asked to speak to Joe Pep (Giancanna). He then said into the telephone, "Be sure to tell Joe Nick [Ferriola] to be at * * * Armand's" at 8 that night. Jack Cerone further stated to Bombacino that if he had any problems he was to straighten them out with James Cerone, or, that failing, to contact Jack Cerone through the pizza maker at Armand's. That evening, Bombacino reported the conversation to Aureli by telephone, prompting Aureli to exclaim, "Well, you will be making more money than I will." [4]

Bombacino returned to Armand's at 8 p.m., finding Jack Cerone and Ferriola already together there. Bombacino joined the two at a booth. Cerone started to introduce Bombacino to Ferriola, but Ferriola stated, "He has been with us a long time." Apparently nothing else transpired at that time.

Early in the evening about two weeks later, Bombacino again met with the Cerones at Armand's Pizzeria. Bombacino told Jack Cerone that "there was a lot of bookies being raided and [he] was a little on the shaky side because [he] was on probation." Jack Cerone replied that Bombacino should not worry because Cerone knew a judge who would take care of things if Bombacino were arrested. Jack Cerone and a companion then left, but Bombacino and James Cerone remained to review Bombacino's records of the week's "Goldblatt" bets. Subsequent to that conference, Jack Cerone would telephone Bombacino each evening, and Bombacino would turn over his records of that day's "Goldblatt" bets.

About March 14, 1967, Bombacino and Cortina met at the former's apartment and Cortina gave Bombacino some money to deliver to a local bettor of Aureli's who had come out ahead for the week. Bombacino made the delivery. On about the same date, Bombacino and Aureli also had a conversation at Bombacino's apartment. Aureli told Bombacino that there was a new system for taking bets whereby bettors would call Aureli and simply give their names to him, whereupon Aureli would telephone another man who, in turn, called the bettor to accept the bet. The record does not reveal whether Bombacino participated in the utilization of this new methodology.

Some time thereafter, Bombacino moved to a new apartment on Darryl Avenue where he continued to operate the book until late July or early August, 1967, when he received a telephone call from James Cerone in the early morning. James Cerone merely told Bombacino not to take any more bets and that no one would be calling him any longer and then hung up the telephone. Bombacino left Chicago in August of 1967.

The Government's case-in-chief included other evidence, testimonial, demonstrative and documentary, which is not related here and which tended to corroborate some of Bombacino's testimony.

The defendants' evidence was largely directed to an attack on the credibility of Bombacino. For example, the Sromeks testified that they never possessed or delivered envelopes at the request of defendants and that those of the defendants who had been in their service station from time to time were there to have their cars serviced. Federenko, Varlas, Kokas and Nicholas Kokenas (the owner of the MGM Lounge) testified in such manner as to place in dispute the

4.  In this connection it should be noted that Bombacino was being paid $200 per week plus an occasional bonus. He stated he picked up his and Aureli's pay envelopes each week at Chester and Bruno Sromek's Sinclair service station where such envelopes were stored in a safe. There was also evidence that Angelini, Cortina and Ferriola were seen on one or more oc- casions at the station or in the company of the Sromeks. The Sromeks were named in the indictment as unindicted co-conspirators. It is also noteworthy that, despite several changes in Bombacino's status and location, his basic rate of pay and the location at which he collected his weekly pay envelope never changed.

veracity of certain meetings and other matters related by Bombacino. Peter Loquercio testified that his childhood friend, Joseph Ferriola, had acquired his nicknames of "Joe Nick" and "Joe Negal" as a child by the common practice in the Italian community of distinguishing boys whose first names were identical by adding the child's father's first name (in this case, Negal or "Nick") as a suffix to the boy's first name. Yolanda Bombacino's testimony tended to establish that she was married to Louis Bombacino and that he had deserted their marital home many years ago without the formality of a divorce and had become a bigamist, at best, or an adulterer.

Defendant Angelini offered testimony in his own defense. His testimony was directed to establishing the propositions that he was neither a gambler nor a conspirator to gamble; that his business was a legitimate one, at best, or, at worst, any illegality in it was an undiscovered legacy from a deceased partner who had started the business; and that he did not know Bombacino and had never participated in any of the conversations or meetings related by Bombacino.

## I

Defendants challenge the sufficiency of the evidence to justify their convictions under several theories. They contend that the testimony of Bombacino was improperly admitted and that, without his testimony, there was no evidence sufficient to convict them; that, even if Bombacino's testimony was properly admitted, there was insufficient evidence to convict; that, if there was evidence sufficient to establish their membership in a conspiracy with regard to gambling, there was insufficient evidence that the scope of the conspiracy included any anti-federal intent; and that the evidence established multiple conspiracies, some inherently local in nature, without establishing that any given defendant was a member of any anti-federal conspiracy. We disagree.

■ Defendants' argument that the testimony of Bombacino was inadmissible against them is essentially three-pronged. First, they assert that Bombacino, as a Government informer, did not possess the requisite intent to violate the law; since he was not a conspirator, therefore, they argue that his testimony should not have been admitted. This argument proceeds, however, on a basic misapprehension of the nature of Bombacino's testimony and of the co-conspirators exception to the hearsay rule. The defendants' argument would be valid if Bombacino had related extra-judicial statements made by *him* out of the presence of the defendants which were offered to prove the truth of the matters thereby asserted by Bombacino. United States v. Morello, 250 F.2d 631, 634 (2d Cir. 1957). But that was not the situation here. Bombacino's testimony was not a restatement of his own prior statements offered as tending to prove the truth of his assertions, but rather his testimony was that certain of the defendants had said and done certain things out of court and out of the presence of other defendants. Bombacino's testimonial role thus was identical to that of a recording device—hearing and seeing certain events, recording them in his memory and then, in effect, playing back the events through his testimony as they had occurred in his presence. Such extra-judicial conversations with some defendants as had occurred out of the presence of other defendants constituted hearsay, it is true. However, extra-judicial statements and acts of co-conspirators occurring during a conspiracy and in furtherance of it have long been held to be competent evidence against their partners in crime under the ancient co-conspirators exception to the hearsay rule. Clune v. United States, 159 U.S. 590, 593, 16 S.Ct. 125, 40 L.Ed. 269 (1895); Logan v. United States, 144 U.S. 263, 308–309, 12 S.Ct. 617, 36 L.Ed. 429 (1892); United States v. Jones, 438 F.2d 461, 466 (7th Cir. 1971). Moreover, the district judge scrupulously instructed the jury during the presentation of Bombacino's testimony and at the close

of the trial with regard to the limited applicability of the hearsay evidence prior to the jury's determination that the existence of the conspiracy and its membership had been proved. United States v. Rizzo, 418 F.2d 71, 82 (7th Cir. 1969), cert. denied, 397 U.S. 967, 90 S.Ct. 1006, 25 L.Ed.2d 260 (1970); United States v. Hoffa, 349 F.2d 20, 41 (6th Cir. 1965), aff'd, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

■■ Secondly, defendants assert that admitting Bombacino's testimony violated the confrontation clause of the sixth amendment. However, in the plurality opinion of Mr. Justice Stewart in Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), it is stated: "It seems apparent that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule [of exclusion] stem from the same roots. But this Court has never equated the two, and we decline to do so now." 400 U.S. at 86, 91 S.Ct. at 218. *Dutton* held constitutional against a sixth amendment challenge a state statute which allowed the admission into evidence of hearsay statements of a defendant's co-conspirators made after the termination of the conspiracy but during the post-conspiracy period of concealment. Admittedly the federal co-conspirators exception is narrower than the statute there in question. Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). But the sixth amendment's confrontation clause applies to the states through the fourteenth amendment with no less vigor than is true of its application to federal prosecutions. *See* Pointer v. Texas, 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The refusal to equate the sixth amendment with the hearsay rule thus applies equally to federal and state prosecutions. Similarly, in California v. Green, 399 U.S. 149, 90 S. Ct. 1930, 26 L.Ed.2d 489 (1970), the Court stated:

> While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. * * * The converse is equally true: merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied.

399 U.S. at 155–156, 90 S.Ct. at 1933. Defendants' rights under the confrontation clause of the sixth amendment were not violated.

■■ Finally in this regard, defendants argue that it was error to admit the testimony of Bombacino as to extrajudicial declarations and acts of the defendants absent prior independent proof of the existence, scope and membership of the conspiracy. It is axiomatic that such declarations and acts of a co-conspirator may not be admitted in evidence against a defendant absent independent evidence establishing his participation in the conspiracy. *E. g.*, Glasser v. United States, 315 U.S. 60, 74–75, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Oltman v. Miller, 407 F.2d 376, 378–379 (7th Cir. 1969); United States v. Stadter, 336 F.2d 326, 329 (2d Cir. 1964); *cf.* Logan v. United States, *supra*, at 144 U.S. 309, 12 S.Ct. 617. Defendants proceed from that well-established principle to assert that there was no such independent evidence here, or, in the alternative, that if there was independent evidence it was insufficient to validate the admission of Bombacino's testimony. These arguments miss the mark, for implicit in both is the assumption that all of Bombacino's testimony is admissible, if at all, under the co-conspirators exception to the hearsay rule.

Even a casual reading of the record, however, reveals that much of Bombacino's testimony related extra-judicial admissions by word or act of a defendant which were properly admissible against that defendant. Although courts have admitted such evidence on the theory that the declarant's words or acts constituted an admission against interest, e. g., Opper v. United States, 348 U. S. 84, 89–90, 75 S.Ct. 158, 99 L.Ed. 101 (1954), the better view is that such admissions are not hearsay at all and are admissible absent other reasons for exclusion. E. g., C. McCormick, Handbook of the Law of Evidence § 239 (1954); 4 J. Wigmore, A Treatise on the Anglo-American System of Evidence in Trials at Common Law § 1048 (1940); Strahorn, A Reconsideration of the Hearsay Rule and Admissions, 85 U.Pa.L.Rev. 484, 488–93 (1937). As evidence independent of the hearsay statement of a co-conspirator, such admissions may quite properly constitute corroborative evidence sufficient to justify the admission of a co-conspirator's hearsay declaration.

■ Such independent, non-hearsay admissions were abundant in this case. Jack Cerone was implicated as a conspirator by his actions at Bombacino's initial meeting with him on December 28, 1966, when he told Bombacino that he had heard nothing but favorable reports about him. James Cerone was shown to be a conspirator by his meeting with Jack Cerone and Bombacino on December 29, 1966, at which time he told Bombacino the methodology of taking the "Goldblatt" bets soon after Jack Cerone had told Bombacino he would be servicing some additional big bettors. Ferriola was connected with the conspiracy by his actions at Bombacino's initial contact with the conspiracy at the meeting on June 25, 1965, when Ferriola stated, "You go to work for Frank [Aureli], but be careful. There are a lot of G heat on the street." Angelini was identified as a conspirator by his exercise of command authority at the meeting on July 2, 1965, when he ordered Angelo

Kokas to call in all bets of $50 or more to Aureli. Cortina also made clear his involvement in the conspiracy when he told Bombacino late in July of 1966 that Aureli was being given a "vacation" because of his several recent gambling arrests and then assigned Bombacino to taking "the out-of-town action" at his apartment. There was thus ample independent evidence that each of the defendants was a participant in a conspiracy involving alleged gambling. Accordingly, the statements and acts of each defendant were admissible against all defendants. United States v. Hickey, 360 F. 2d 127, 140 (7th Cir.), cert. denied, 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966).

■ As for defendants' contention that the evidence against them was insufficient to justify their convictions, we have no doubt that the record before us discloses sufficient evidence from which the jury could properly have determined that there was one conspiracy as charged in Count One of the indictment, that all of the defendants were members of such conspiracy, that the scope of the conspiracy included the jurisdictionally necessary anti-federal element of conspiring to use facilities in interstate commerce, and that at least one overt act in furtherance of the conspiracy occurred subsequent to its inception and during the period covered by the indictment. A review of the evidence reveals that the conspiracy was characterized by a clearly defined hierarchy in which Bombacino was at, or near, the bottom and subject to the orders of all the defendants. From such a vantage point, Bombacino's ability to observe the workings of the conspiracy was restricted; but, due to the apparent trust placed in him as a rising minion or, perhaps, to an overabundance of confidence, the defendants readily revealed their respective positions in the conspiracy, as well as its scope, to Bombacino by their words and deeds. From the evidence adduced at trial, we are satisfied that the jury could properly have determined that the de-

fendants' guilt was established beyond a reasonable doubt.

Defendants contend further, however, that proof of specific knowledge of the use of facilities in interstate commerce is essential to a conviction for conspiring to violate 18 U.S.C. § 1952 and that there was no proof of such knowledge as to any of them adduced at trial. The Government asserts, on the other hand, that proof of specific knowledge of the use of facilities in interstate commerce is not essential to a conviction for conspiracy to violate section 1952, citing United States v. Hanon, 428 F.2d 101 (8th Cir. 1970), cert. denied, 402 U.S. 952, 91 S.Ct. 1608, 29 L.Ed.2d 122 (1971), and United States v. Roselli, 432 F.2d 879 (9th Cir. 1970), cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971), which squarely held such proof is not required. However, we need not decide whether the *Hanon-Roselli* rule should be followed in this circuit, for we are convinced that this record contains ample proof of the knowledge of each of the defendants that the use of facilities in interstate commerce was included within the scope of the conspiracy. We believe the jury could properly have found from the evidence, as it did, that all defendants had conspired to use such facilities for illegal gambling.

The proof in this case established that Bombacino, as the underling he was, was moved from place to place several times and was subjected to changes of duties at the whim of the defendants. The evidence adduced clearly proves that Bombacino was subject to the orders of each of the defendants, and, moreover, was paid the same amount from the same source regardless of the nature of his duties, the location of his place of business, or the identity of his apparent superiors. The evidence is also unequivocal that shortly after Bombacino was received as a co-conspirator he began to receive telephone calls from out-of-state bettors without any evidence whatever that he had solicited such business in any way. And it is also clear that Bombacino continued to receive such out-of-state telephone calls without interruption regardless of changes in the nature of his duties, the location of his place of business, the identity of his apparent superiors, and even without regard for changes in his telephone numbers on little advance notice, all without evidence of Bombacino's having communicated such changes to out-of-state bettors. Given such evidence and in light of other competent evidence of the hierarchial nature of the conspiracy and the constant exchange of information among the conspirators, we believe the jury was entitled to conclude that out-of-state telephone calls from bettors were induced by the defendants originally and that changes in Bombacino's scope of operation, his location and his telephone numbers were transmitted to out-of-state bettors by the defendants or by others at their direction. Consequently, we conclude that there was ample evidence that all of the defendants were aware of the anti-federal element of the conspiracy and participated in it.

Defendants' additional argument that multiple conspiracies were proved under Count One is predicated upon the unlikely theory that each time Bombacino's duties or locus of operation changed a new conspiracy was revealed. The evidence belies that theory, especially the evidence that Bombacino's compensation remained the same despite such changes, and we reject that argument as well.

Thus we are satisfied that the evidence adduced at trial, viewed in the light most favorable to the Government, amply supports the jury's verdict that all of the defendants were guilty as charged in Count One of the indictment.

## II

Defendant Angelini argues that 18 U.S.C. § 1952 is unconstitutional as violative of the first, sixth and ninth amendments to the Constitution, as well as attacking its application to him as constituting an ex post facto law forbidden by article one, section nine, clause three of the Constitution. We hold that each of these contentions is without merit.

Angelini's first amendment argument is, in essence, that, since newspapers and other media frequently report predictions as to the outcomes of various athletic events—indeed, some of which are similar to or based upon Angelini's computation of odds and point spreads—and such communication is protected by the first amendment, Angelini's telephonic communication of such information is similarly protected. We rejected such an assertion in United States v. Lookretis, 385 F.2d 487, 489 (7th Cir. 1967), vacated on other grounds, 390 U. S. 338, 88 S.Ct. 1097, 19 L.Ed.2d 1219 (1968), and we again reject it. Angelini's first amendment claim erroneously proceeds on the implicit assumption that the known use and purpose of communication is not relevant to the determination of whether the communication may be prohibited consistent with the first amendment. It is clear that speech or conduct ordinarily protected by the Constitution may lose that protection because of the intent of the speaker or actor or the context within which it occurs. E. g., Ginzburg v. United States, 383 U. S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966). The communication of opinions as to the outcome of future athletic contests may not threaten valid community interests in other contexts, but such communication clearly threatens legitimate community interests when it occurs as a part of an illegal gambling operation crossing state boundaries.

Angelini's assertion that section 1952 violates the sixth amendment in that it is so vague that persons of common understanding are not adequately advised of what it is that is proscribed similarly lacks merit. In United States v. Zizzo, 338 F.2d 577, 579 (7th Cir. 1964), cert. denied, 381 U.S. 915, 85 S. Ct. 1530, 14 L.Ed.2d 435 (1965), we squarely held that section 1952 was constitutional against a challenge on the ground that it was vague. We reaffirm that holding.

As a further ground for his assertion that section 1952 is unconstitutional, Angelini argues that the statute "enlarg[es] a state statute in violation of the ninth amendment." The gist of this argument is that section 1952 was meant to aid the states in the enforcement of their criminal statutes where facilities in interstate commerce were used in the violation of such statutes; that the statute the enforcement of which is here being aided, Illinois Revised Statutes, Chapter 38, Section 28–1(a), is subject to a statute of limitations of eighteen months; and that section 1952 incorporates the statute of limitations of the state statute it is aiding. Ergo, Angelini argues, since this prosecution was not commenced within the eighteen month limitation period, the convictions must be reversed. However, as Mr. Justice Clark, sitting on this court, stated in United States v. Karigiannis, 430 F.2d 148, 150 (7th Cir.), cert. denied, Panagiotopoulos v. United States, 400 U.S. 904, 91 S.Ct. 143, 27 L.Ed.2d 141 (1970):

[T]he gravamen of a charge under § 1952 is the violation of federal law and "reference to state law is necessary only to identify the type of unlawful activity in which the defendants intended to engage." [Citing United States v. Rizzo, 418 F.2d 71, 74 (7th Cir. 1969), cert. denied, Tornabene v. United States, 397 U.S. 967, 90 S.Ct. 1006, 25 L.Ed.2d 260 (1970).]

Thus the fact that the illegal activity in furtherance of which facilities in interstate commerce were used could not be prosecuted under state law because of Illinois' statute of limitations is irrelevant to a prosecution under 18 U.S.C. § 1952. Indeed, as we held in United States v. Rizzo, 418 F.2d 71, 80 (7th Cir. 1969), cert. denied, Tornabene v. United States, 397 U.S. 967, 90 S.Ct. 1006, 25 L.Ed.2d 260 (1970), proof of the violation of the state statute to which reference is made for purposes of prosecution under 18 U.S.C. § 1952 is not an essential element to be proved in such a federal prosecution. State law thus serves merely a definitional purpose under section 1952. That being the case, section 1952 does not enlarge state criminal statutes at all because it punishes

the use of facilities in interstate commerce in furtherance of enterprises violative of state statutes; it does not punish substantive violations of the state statutes per se. Section 1952, therefore, does not "enlarge a state statute in violation of the ninth amendment" as contended by Angelini.

■ Angelini's final attack on the constitutionality of section 1952 is the assertion that it constitutes an ex post facto law violative of article one, section nine, clause three of the Constitution. The theory of this argument is that section 1952 on its face proscribes the use of interstate facilities in any form in furtherance of gambling, thereby rendering it violative of the first amendment by Angelini's lights; that the statute was not narrowed to constitutionally permissible scope until Angelini v. Illinois Bell Tel. Co., 418 F.2d 111 (7th Cir. 1969), cert. denied, 397 U. S. 1040, 90 S.Ct. 1361, 25 L.Ed.2d 651 (1970), limited its application to rapid transmission of gambling information; and that such limitation did not occur until after the conduct which gave rise to this prosecution had occurred. Taking Angelini's argument at face value, we do not find the limiting construction of section 1952 to be an unreasonable interpretation of the statute which, if such were the case, might provide an arguable basis for his ex post facto law assertion. Williams v. United States, 179 F.2d 644, 647 (5th Cir. 1950). 18 U.S.C. § 1952 does not constitute an ex post facto law as applied here.

### III

Defendants also assert that certain procedural or trial errors require the reversal of their convictions. They argue that the district court should have ordered production of the minutes of the grand jury which led to an indictment which was subsequently superseded by a second indictment upon which this trial proceeded; that the district court improperly limited defendants' discovery of certain evidence of electronic eavesdropping; that the district court erred in admitting certain testimony of the United States Attorney; that the prosecutor's conduct, especially in final argument, was improper and prejudicial, and that such defects were uncured before verdict; that the trials of these defendants should have been separate for one or more reasons; that the divulgence of certain telephone toll call records to the Government violated 47 U.S.C. § 605; and that the seizure and introduction into evidence of certain unopened mail discovered in Angelini's office was improper. We find each of these arguments to be without merit.

■ Production of the minutes of the proceedings of the grand jury which returned the original indictment in this case was not necessary, nor, we believe, would it have been helpful to the defendants. Grand jury minutes are not available as of course to defendants in federal criminal trials, but rather may be made available in the exercise of the trial court's discretion when the defense has shown that " 'a particularized need' exists for the minutes which outweighs the policy of secrecy [of the grand jury's proceedings]." Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 399–400, 79 S.Ct. 1237, 1241, 3 L.Ed.2d 1323 (1959). Here, the initial indictment was based upon the testimony of an agent of the FBI who testified as to the contents of Bombacino's reports to that agency. Bombacino himself did not testify at all at the first grand jury proceeding which related to this cause. Although the first indictment named only Jack Cerone, Aureli and Angelini as defendants and the superseding indictment added James Cerone and Ferriola as additional defendants, that disparity does not supply the "particularized need" showing required by Pittsburgh Plate Glass Co. The agent's testimony which led to the first indictment was based on Bombacino's statements to various FBI agents, copies of all of which statements were given to defendants in the course of the trial. The minutes of the first grand jury proceeding thus could not be useful either for impeachment or cross-examination

purposes, for the defendants had at their disposal the best evidence of what was the basis of the charges against them under both indictments. In addition, the trial court compelled the production of the minutes of the second grand jury proceedings. Defendants were not entitled to more.

■ Ferriola contends that the disclosure of electronic eavesdropping required by the district court was insufficient and prejudiced his ability to eliminate illegally obtained evidence from the trial. That contention is groundless. The Government provided Ferriola with copies of "logs" of all illegally overheard conversations in which he was identified as a participant. It was also established that nothing illegally overheard as revealed in such logs was relevant to this trial; and, in addition, the district court examined in camera a voluminous sheaf of logs containing reports of unidentified voices overheard and found that none of such logs was relevant to this trial. Indeed, it was established that "every time there was a possibility" in the view of the overhearing agent that Ferriola was present at an illegally overheard conversation the fact was recorded, and logs of all such occasions were made available to him. Moreover, Ferriola made no showing of his standing to object to any illegally overheard conversations other than those as to which logs were provided him. The trial court thus committed no error in its management of Ferriola's discovery of evidence obtained by illegal eavesdropping.

■ Defendants also assert that the district court erred in admitting the testimony of the then United States Attorney, who was not personally prosecuting this case. They argue that the presence of the United States Attorney as a witness for the prosecution was prejudicial because of the prestige of his office; that his testimony was not properly admitted as rebuttal testimony to controvert the testimony of defendants' witness Kokenas; and that, while the fact of his testifying was itself prejudicial, his testimony that Kokenas expressed fear of "those fellows" was unduly prejudicial, and its admission served no legitimate purpose. As to the awesome-office theory, we do not agree that the mere fact that a witness holds an office of public trust should disqualify him as a witness if he would otherwise be able to offer relevant, competent and material evidence as to any issue in a trial. Defendants offered Kokenas as a witness apparently to create the impression in the jurors' minds that the prosecutors had withheld from the grand jury and defense counsel evidence favorable to defendants. On direct examination, Kokenas, who owned the MGM Lounge, testified that Ferriola never met anyone or ate in the Lounge but sometimes came in to pick up carry-out food, thus contradicting the Government's evidence of the meeting held there on June 26, 1965. He also testified that he had told the Government the same thing when they questioned him and that a meeting with the United States Attorney in the offices of his former law firm had not been suggested by him in any way. The United States Attorney testified in rebuttal that Kokenas had said that he had seen Ferriola, Turk Turello, Angelo Kokas and Aureli together in the Lounge at times, but didn't know if they were there on June 26, 1965. He also testified that Kokenas had said that he couldn't talk to anyone in the federal building, stating, "I can't talk to you here. Those fellows can't know that I am talking to you." He testified that Kokenas had said he was willing to talk to him in some place other than the federal building. It is clear, therefore, that there was direct contradiction between Kokenas' testimony and that of the United States Attorney. It is also clear that evidence of his fear may be presented as a means of demonstrating a witness' bias, thereby tending to discredit him. United States v. DeLutro, 435 F.2d 255, 256–257 (2d Cir. 1970); United States v. Schennault, 429 F.2d 852, 855 (7th Cir. 1970). As for defendants' argument that they were prejudiced by the failure of the United States Attorney to identify which, if any, of the defendants Kokenas was

afraid of, we conclude that defendants waived that issue by failing either to cross-examine the United States Attorney or to call Kokenas in surrebuttal on that point. United States v. Cook, 432 F.2d 1093, 1101–1102 (7th Cir. 1970), cert. denied, 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535 (1971).

Defendants further claim that the conduct of the prosecutors was prejudicial, both during the trial-in-chief and during the Government's closing argument. Defendants cite several incidents of allegedly prejudicial conduct as being sufficiently damning as to require reversal. Having carefully reviewed the entire record of this trial, however, we do not believe that any such incident or series of incidents cited by defendants deprived them of a fair trial. It is true that in the heat of trial the prosecutors made occasional rash statements which were to some degree improper. However, the district judge rectified such problems by appropriate admonitions to counsel and the jury, and the offending prosecutor apologized, sua sponte and in the presence of the jury, to the court and counsel for one such inappropriate comment. As Judge Learned Hand stated in United States v. Wexler, 79 F.2d 526, 529–530 (2d Cir. 1935), cert. denied, 297 U.S. 703, 56 S.Ct. 384, 80 L.Ed. 991 (1936):

> It is impossible to expect that a criminal trial shall be conducted without some show of feeling; the stakes are high, and the participants are inevitably charged with emotion. Courts make no such demand; they recognize that a jury inevitably catches this mood and that the truth is not likely to emerge, if the prosecution is confined to such detached exposition as would be appropriate in a lecture, while the defense is allowed those appeals in misericordiam which long custom has come to sanction. The question is always as to the particular incident challenged, in the setting of the whole trial.

We hold that the prosecutors' conduct, in the context of the whole trial and in view of the district judge's scrupulous policing of arguable improprieties, was not prejudicial.

Defendants also assert as error the failure of the district court to sever the trial of each defendant. It is well established that a district court's denial of motions for severance may constitute reversible error "only if prejudice is so clearly shown that refusal of a severance is an abuse of discretion." United States ex rel. Durso v. Pate, 426 F.2d 1083, 1089 (7th Cir. 1970), cert. denied, 400 U.S. 995, 91 S.Ct. 469, 27 L.Ed.2d 445 (1971). No such showing of prejudice has been made here.

Angelini argues that the disclosure to the FBI by the telephone company of its toll call records with regard to telephones listed to Bombacino, Sammy Molose, Model Construction Company (a fictitious company in whose name the telephone was answered at the 6955 West Grand Avenue book) and Frank A. DeSoto (Aureli's alias at the 4355 South Sawyer book) violates 47 U.S.C. § 605. He makes the same argument with regard to the disclosure to the FBI by the management of the Washington Pines Hotel, one of Aureli's residences, of similar records with regard to the telephone in Aureli's room. Assuming that Angelini has standing to interpose this objection, we agree with the determination of the Second Circuit in United States v. Covello, 410 F.2d 536, 541–542 (2d Cir.), cert. denied, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969), that such records made and maintained in the ordinary course of business for accounting purposes are properly to be accorded the same evidentiary treatment as the records of other businesses and are without the scope of section 605. Such disclosure as occurred here did not violate 47 U.S.C. § 605.

Angelini also contends that the seizure of certain unopened mail discovered in his office upon the execution of valid search warrants was illegal. He also contends that the opening of one such envelope addressed to John DiDo-

menico in care of Angelini's firm and the introduction into evidence of the envelope itself was improper. We determined that the search and seizure was proper in Angelini v. Illinois Bell Tel. Co., 418 F.2d 111, 115 (7th Cir. 1969), cert. denied, 397 U.S. 1040, 90 S.Ct. 1361, 25 L.Ed.2d 651 (1970), when Angelini's counsel specifically raised the issue of the propriety of the seizure of a number of items, including the unopened mail. Angelini cites no convincing reason to disturb that determination, and we shall not do so. His contention with regard to the opening of the DiDomenico letter is vague and unpersuasive, especially in view of the fact that the contents of the envelope were not offered in evidence. We find no error.

## IV

Finally, Angelini raises several challenges which relate only to the validity of his convictions. He asserts that Count Three of the indictment was insufficient to charge an offense and that, if it was, the evidence was insufficient to convict him on that count; that it was improper to permit the use in this case of his testimony in a prior civil proceeding to compel the Government to have his telephone service reinstated after it had been terminated pursuant to 18 U.S.C. § 1084(d); and that the Government's trying him on Count Three after having terminated his telephone service pursuant to 18 U.S.C. § 1084(d) subjected him to double jeopardy.

■ Angelini's argument that Count Three of the indictment is inadequate to charge to offense is without merit. He bases his argument on the theory that an indictment charging a substantive violation of 18 U.S.C. § 1952 must recite the particulars of the use of the interstate facility charged. The indictment recited all of the necessary elements of the offense. See Turf Center, Inc. v. United States, 325 F.2d 793, 796 (9th Cir. 1963). It did omit the opposite pole of the use of an interstate facility, stating only that the United States mail was used "in interstate commerce" "at

Chicago, Illinois" on or about a certain date. However, the question of the location of the other terminal of the use is in the nature of evidentiary matter to be discovered by a motion for a bill of particulars. Carbo v. United States, 314 F.2d 718, 731–733 (9th Cir. 1963), cert. denied, 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498 (1964). The additional information desired by Angelini was supplied by the Government in its bill of particulars provided pursuant to his motion. We hold that Count Three of the indictment was sufficient to charge an offense under 18 U.S.C. § 1952.

■ Angelini's challenge to the sufficiency of the evidence to convict him on Count Three is based chiefly on two theories: that, since the use of the mails was an out-of-state customer's mailing a payment to him, he did not use the mails and that there is no evidence negating the possibility that the payment to Angelini was for printed schedules sold to the general public and not for providing the line. There was evidence before the jury that the customer had paid Angelini $350 for a football season's service and that the printed publication Angelini distributed cost $.25 per copy per week. There was no evidence that the customer subscribed to more than one copy per week; indeed the evidence was that he subscribed for his personal use alone. We believe the jury was entitled to infer arithmetically that much of the $350 fee was for the line provided by Angelini, especially in view of the fact that the evidence established that the customer called Angelini as frequently as a dozen times a week. Therefore, even if we assume that Angelini's printed materials were not prohibited from interstate distribution, the evidence was sufficient to establish that Angelini made use of the mails to distribute the line to his out-of-state customer who also made use of the mails in paying for Angelini's services. The evidence of guilt under Count Three was adequate.

■ The contention is also meritless that introduction in this trial of Angelini's prior testimony in the suit he filed

to reinstate his telephone service terminated pursuant to 18 U.S.C. § 1084(d) violated his fifth amendment privilege against self-incrimination. As clearly held in Telephone News Sys., Inc. v. Illinois Bell Tel. Co., 220 F.Supp. 621, 628 (N.D.Ill.1963) (three-judge court), aff'd mem., 376 U.S. 782, 84 S.Ct. 1134, 12 L. Ed.2d 83 (1964), the Government has the burden of proving the propriety of termination in a suit brought to compel the reinstatement of telephone service terminated pursuant to section 1084(d). As the court there said regarding such actions. "[P]laintiff is at no point required to come forward with evidence, much less testimony, until defendant has satisfied this burden. Even then, a plaintiff is not required to take the stand or otherwise incriminate himself." In Angelini's civil suit for restoration of his telephone service, he was called as an adverse witness by the Government pursuant to Rule 43(d) of the Federal Rules of Civil Procedure. Upon objection by Angelini's counsel, the Government attorney correctly stated to Angelini that his fifth amendment privilege was available to him. Angelini did not assert his privilege and testified *both* as an adverse witness on behalf of the Government and as a rebuttal witness on his own behalf. Angelini thus waived his fifth amendment privilege without compulsion by the Government since, as is stated above, it was the Government, not Angelini, who had the burden of proof in the section 1084(d) suit.

Angelini also argues that termination of telephone service pursuant to 18 U.S.C. § 1084(d) followed by prosecution for violation of 18 U.S.C. § 1952 arising out of the same conduct violates the prohibition against double jeopardy under the fifth amendment. However, as the Supreme Court said in Helvering v. Mitchell, 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938):

> Congress may impose both a criminal and a civil sanction in respect to the same act or omission; for the double jeopardy clause prohibits merely punishing twice, or attempting a second

time to punish criminally, for the same offense. The question for decision is thus whether [the statute there in question] imposes a criminal sanction. That question is one of statutory construction.

Here, the question therefore becomes whether 18 U.S.C. § 1084(d) imposes a criminal sanction. It is clearly established that section 1084(d) is nonpenal in intent and does not impose criminal sanctions. Telephone News Sys., Inc. v. Illinois Bell Tel. Co., *supra*, 220 F.Supp. at 628–633. Angelini has not been subjected to double jeopardy for the same offense.

The judgments of the district court are affirmed.