563 F.2d 1083
 UNITED STATES of America
v.
Rocco FRUMENTO, Andrew J. Millhouse, George W. Collitt, John
R. Sills, Vito N. Pisciotta, a/k/a Vic,
Andrew Millhouse, Appellant in No. 77-1090, John R. Sills,
Appellant in No. 77-1127.
 Nos. 77-1090, 77-1127.
 United States Court of Appeals,
Third Circuit.
 Argued June 7, 1977.
Decided Aug. 18, 1977.
As Amended Sept. 30, 1977.
 
 Edward H. Weis, Defender Assoc. of Philadelphia, Philadelphia, Pa. (Appellant in 77-1090).
 Richard G. Phillips, Philadelphia, Pa. (Appellant in 77-1127).
 David W. Marston, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, Appellate Section, Alan M. Lieberman, Bonnie B. Leadbetter, Asst. U. S. Attys., Philadelphia, Pa., for appellee.
 OPINION OF THE COURT
 Before ALDISERT, ROSENN and HUNTER, Circuit Judges.
 ROSENN, Circuit Judge.
 
 
 1
 Appellants Andrew Millhouse and John R. Sills were indicted in the United States District Court for the Eastern District of Pennsylvania for violations of 18 U.S.C. § 1962(c) and (d) (racketeering activity and conspiracy)[1] and 26 U.S.C. § 7206(1) (fraud and false statements in making and subscribing to federal income tax returns for the calendar year 1971 and 1972).[2] They were tried before a jury together with co-defendant Rocco Frumento and after a trial lasting almost two weeks were found guilty on all counts.[3]
 
 I.
 
 2
 This case presents several important issues of first impression in this circuit growing out of a conspiracy to smuggle cigarettes into Pennsylvania for resale without payment of the Pennsylvania cigarette tax. During the period of the conspiracy, June 1971 through mid-March 1972, appellant Sills was in charge of patronage for Peter Camiel, chairman of the Philadelphia Democratic City Committee. Millhouse was the supervisor of the District II office of the Pennsylvania Department of Revenue's Bureau of Cigarette and Beverage Taxes ("BCBT" or the "Bureau"). The district II geographic area comprised Philadelphia and its four surrounding counties. As the district supervisor, Millhouse had direct administrative control over all the investigators within his district.
 
 
 3
 The events here at issue began in 1971 with an effort by Sills to secure Frumento's appointment to a position with the Bureau. While Frumento's appointment was pending, Vito Pisciotta, a Philadelphia lawyer, introduced Frumento to his client, Harold J. Sharp, a Philadelphia cigarette wholesaler with prior convictions for felonies. In a series of meetings with Sills and Pisciotta, Frumento revealed a plan to import large quantities of untaxed cigarettes into the state of Pennsylvania, to affix counterfeit Pennsylvania tax stamps to them, and to provide "protection" to his accomplices through his position with the Bureau. Frumento informed Sharp that he expected the latter to act as the outlet for the untaxed cigarettes. It was agreed that Sharp would provide the necessary capital to purchase the untaxed cigarettes and Frumento and the others would obtain and transport the cigarettes into Pennsylvania, affix the counterfeit stamps, and deliver them to Sharp's warehouse.
 
 
 4
 In August 1971, Frumento commenced the transportation of cigarettes from North Carolina to Sharp's warehouse in Philadelphia from whence they were distributed and sold. Sills, Frumento, and Pisciotta were each to receive $1,000 weekly from the operation. About the time that the conspiracy began, Frumento was appointed a field inspector with BCBT. Within several weeks after the commencement of the conspiracy, Sills had effectively gained the ability to hire and fire personnel at the District II office of BCBT. Millhouse was offered, and accepted, the opportunity to participate in the smuggling operation at $500 per week. Roy Wade, a field inspector in BCBT under Millhouse's jurisdiction, was later offered a similar opportunity to participate in the conspiracy at a figure of $200 weekly which he accepted.
 
 
 5
 The cigarette smuggling operation continued for about thirty weeks and terminated with the arrest of Harold Sharp on March 13, 1972. In May 1972 the Commonwealth of Pennsylvania arrested Sills following a grand jury investigation and he, Sharp, Millhouse, and Frumento were charged under Pennsylvania criminal laws with bribery, extortion, and conspiracy, respectively. In June 1972, Sills, Frumento, and Millhouse stood trial in the Philadelphia Municipal Court on these charges and were found not guilty by Judge Calvin Wilson, Court of Common Pleas of Philadelphia County sitting as a municipal court judge.[4] On May 22, 1975, the appellants were indicted in the United States District Court in an eleven count indictment on the charges described in the first paragraph of this opinion.
 
 
 6
 Of the series of issues raised on this appeal we believe only two warrant discussion: (1) Were Millhouse's convictions on count I (substantive offense of racketeering) and on count II (conspiracy) of the indictment and Sills' conviction on count II (conspiracy) of the indictment barred by the double jeopardy clause of the fifth amendment of the United States Constitution because of his prior acquittal in state court? (2) Is the Pennsylvania Bureau of Cigarette and Beverage Taxes an "enterprise" within the meaning of Title IX of the Organized Crime Control Act of 1970?
 
 II.
 
 7
 Both appellants claim that their federal prosecution was barred by the double jeopardy clause of the fifth amendment[5] to the Constitution. In considering a pretrial motion filed by the co-defendant, Frumento, who also asserted the same contention, the district court capsulized the factual basis for the appellants' claim as follows:
 
 
 8
 In June 1972 (the defendants were) tried and acquitted in Philadelphia Municipal Court on the charges of bribery, extortion and conspiracy to accept bribes and avoid payment of the Pennsylvania cigarette tax. The state indictment was based on the same alleged activity as the present federal indictment, which charges that (the defendants) violated 18 U.S.C. § 1962(c) by engaging in the conduct of the Bureau's affairs through a pattern of racketeering activity.
 
 
 9
 United States v. Frumento, 409 F.Supp. 136, 139 (E.D.Pa.1976). The same operative facts apply to Millhouse and Sills.[6]
 
 
 10
 On the authority of Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959),[7] the district court rejected the contention that successive state and federal prosecutions are barred by the double jeopardy clause; it also rejected the argument that the doctrine of collateral estoppel barred this prosecution. See Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).
 
 
 11
 The Supreme Court and many United States courts of appeals which have had the occasion to consider the question have followed the general principle that a federal prosecution is not precluded by a prior state prosecution of the same person for the same act. In Abbate v. United States, supra, the Court again reviewed the issue. Petitioners in that case had been indicted and convicted in an Illinois state court for violating a state statute making it a crime to injure or destroy the property of another and were thereafter indicted and convicted in the federal court for conspiracy, in violation of a federal statute, 18 U.S.C. § 1362, to destroy certain communications facilities operated or controlled by the United States. The same misconduct was the basis of both convictions. Petitioners asked the court to override United States v. Lanza, 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922), wherein it had squarely upheld a federal prosecution arising out of the same facts which had been the basis of a state conviction. The Court, however, found no persuasive reason for departing from the firmly established principle to which we have just alluded. On the contrary, it observed that "undesirable consequences would follow if Lanza were overruled." Abbate v. United States, 359 U.S. at 195, 79 S.Ct. at 671.
 
 
 12
 Millhouse and Sills argue that their prior acquittals in the Philadelphia Municipal Court on the very state law charges which formed the basis of their indictment under 18 U.S.C. § 1961 et seq. bars their trial and conviction on counts I and II. Section 1961, they claim, incorporates the state law charges in making it a crime to commit a pattern of state offenses. Specifically, they assert that count I of the indictment charges the same acts of bribery of which they were acquitted in the state court and that this distinguishes their case from Bartkus v. Illinois, supra, and Abbate v. United States, supra, wherein the successive prosecutions were for violations of different statutes of different sovereigns. In the instant case, although the bribery of a state official is not a federal crime, they argue that 18 U.S.C. § 1961 et seq. makes it a federal crime, inter alia, to commit a "pattern" of state offenses in certain circumstances and, of necessity, gives the federal courts jurisdiction to try the underlying state offenses.
 
 
 13
 We have examined the cases cited by appellants but we do not find that any of them support their contention. Their principal case, United States v. Mason, 213 U.S. 115, 29 S.Ct. 480, 53 L.Ed. 725 (1909), expressly turned on the construction of a federal statute; it narrowly inquired into the meaning and scope of a citizen's right to vote law. Mason had been acquitted in a state court of the murder of a federal officer. Subsequently, he was charged in a federal court with conspiring to hinder or obstruct federal officers in the exercise of rights secured to them under the laws of the United States and with committing the murder of a federal officer as part of the conspiracy. The conspiracy charge was in violation of section 5508 of the Revised Statutes as to which section 5509 provided that, "if in violating any provision of the two preceding sections any other felony or misdemeanor be committed, the offender shall be punished . . . with such punishment as is attached to such felony or misdemeanor by the laws of the state in which the offense is committed." The appellants extrapolate and rely on certain language of the Mason court indicating the duty of a federal court to accept the judgment of a state court "based upon a verdict of acquittal of a crime against the state whenever, in a case in federal court, it becomes material to inquire whether that particular crime against the state was committed by the defendants on trial in the federal court for an offense against the United States." Mason, however, is neither a double jeopardy nor a collateral estoppel holding. The murder at issue in Mason did not constitute an offense against the United States. Mason did not hold that a federal indictment predicated upon state offenses was barred by a prior state acquittal.[8]
 
 
 14
 Contrasted with the murder offense examined in Mason, the conduct with which the present appellants were charged in the state courts did offend the United States. Section 1961 et seq. of the Federal Racketeering Act forbids "racketeering," not state offenses per se. The state offenses referred to in the federal act are definitional only; racketeering, the federal crime, is defined as a matter of legislative draftsmanship by reference to state law crimes.8A This is not to say, as the dissent suggests, that the federal statute punishes the same conduct as that reached by state law. The gravamen of section 1962 is a violation of federal law and "reference to state law is necessary only to identify the type of unlawful activity in which the defendant intended to engage." United States v. Cerone, 452 F.2d 274, 286 (7th Cir. 1971), quoting Mr. Justice Clark in United States v. Karigiannis, 430 F.2d 148, 150 (7th Cir.), cert. denied, 400 U.S. 904, 91 S.Ct. 143, 27 L.Ed.2d 141 (1970). The Cerone court, which considered the relationship between federal and state statutes in the context of the Travel Act, 18 U.S.C. § 1952 stated:
 
 
 15
 (The federal statute) does not enlarge state criminal statutes at all because it punishes the use of facilities in interstate commerce in furtherance of enterprises violative of state statutes; it does not punish substantive violations of the state statutes per se.
 
 
 16
 452 F.2d at 286-87.
 
 
 17
 Millhouse and Sills also seek to demonstrate that it would require a "significant expansion" of the dual sovereignty doctrine on which Abbate v. United States and Bartkus v. Illinois were based[9] to affirm the convictions on counts I and II of the indictment in this case; the dual sovereignty doctrine, they say, has been eroded in recent years and is no longer accepted. At oral argument counsel for Millhouse was specifically asked whether his research disclosed any Supreme Court case that has modified or diluted Abbate and he could point to none.
 
 
 18
 Appellants' briefs in this court point to the decisions of the Supreme Court in Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), Murphy v. Waterfront Commission, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), and Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), in support of their thesis that the dual sovereignty doctrine as it applies to successive federal and state prosecutions is no longer good law. We find that none of these cases deal with dual sovereignty as a theory under which different jurisdictions can prosecute related crimes but rather with the question of whether the doctrine of dual sovereignty may serve to avoid infringements of constitutional rights. Moreover, the fact is that Abbate has been consistently followed by courts of appeals since 1959, and the Supreme Court has routinely denied certiorari.[10]
 
 
 19
 The facts of the instant case do not require any expansion of the dual sovereignty doctrine as suggested by the appellants. On the contrary, the appellants' conduct, even though it may have involved the same operative facts considered in the state court, also contains an additional element of significance to the federal courts though not the state court the effect of their state operation on interstate or foreign commerce through a pattern of racketeering activity.[11] The facts of this case amply support the pragmatic wisdom of the Abbate holding, and in view of Abbate we reject appellants' double jeopardy claim.
 
 III.
 
 20
 Counts I and II of the indictment identify the Bureau of Cigarette and Beverage Taxes, an agency of the Commonwealth of Pennsylvania as having constituted an "enterprise" as defined by 18 U.S.C. § 1961(4) which enterprise was engaged in, and the activities of which, affected interstate commerce. That section of the Act defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Millhouse and Sills contend that a reading of Title IX of the Organized Crime Control Act of 1970 as a whole, including section 1961, reveals that the term "enterprise" cannot be construed to embrace a state taxing and enforcement agency such as the Bureau.
 
 
 21
 The district court, initially in its pre-trial orders, United States v. Frumento, 405 F.Supp. 23 (E.D.Pa.1975), concluded that the Bureau was an arm of the Department of Revenue charged with the statutory duty to collect taxes imposed by law upon the sale of cigarettes in Pennsylvania. 72 P.S. § 203(n). It therefore held that the Bureau was a "legal entity" and thus an "enterprise" within the definition of the Organized Crime Control Act of 1970.
 
 
 22
 Appellants vigorously assert on appeal that a reading of the statute, 18 U.S.C. § 1961 et seq., supports their contention that the term "enterprise" was never intended to include governmental organizations. First, they say violations of section 1962 not only gave rise to criminal penalties, but the district courts of the United States are also given extensive civil remedy powers in the event of violation of the statute, including the power to order dissolution or reorganization of any "enterprise," 18 U.S.C. § 1964;[12] and that Congress could not have intended to give the courts the power to order dissolution or reorganization of a state agency. Secondly, appellants argue that since section 1964(c) permits private persons to sue and recover treble damages for violations of section 1962, Congress could not have intended, in view of the limitations of the eleventh amendment, to allow suits against state governmental bodies. Finally, appellants argue that in construing the statutory definition of "enterprise," the phrase "other legal entity" following nouns of narrow scope relating to different forms of business ventures, must be construed under the rule of ejusdem generis in the light of the narrow terms which follow. Thus, the words of the final clause in the definition dealing with nonlegal entities indicate Congress intended to limit the term "enterprise" to private business or labor organizations.
 
 
 23
 Appellants also take comfort in the absence of any reference to governmental bodies in the legislative history of the Organized Crime Control Act of 1970. In this respect, they rely heavily in support of their position on United States v. Mandel, 415 F.Supp. 997 (D.Md.1976). The district court in that case concluded that the silence of the legislative history of Title IX of the Organized Crime Control Act as to whether an enterprise may include such public entities as governments and states suggests a narrow construction of the statute. Since the major purpose of Title IX is "to rid racketeering influences from the commercial life of the nation," the district court believed that reading "enterprise" to include public entities would do violence to the plain purpose of Title IX. Thus, predicating its decision on its analysis of the legislative history, the purpose of Title IX and the doctrine of ejusdem generis, the court held that the state of Maryland was not an "enterprise" within the meaning of the racketeering statute. We disagree.
 
 
 24
 We begin our discussion with an assessment of the ejusdem generis doctrine. It is not a rule of law but merely a useful tool of construction resorted to in ascertaining legislative intent. The rule should not be employed when the intention of the legislature is otherwise evident. Commonwealth v. Brady, 228 Pa.Super. 233, 323 A.2d 866, 870 (1974). Nor should it be applied to defeat the obvious purpose of the statute or to narrow the targets of Congressional concern. "The rule of 'ejusdem generis' is applied as an aid in ascertaining the intention of the legislature, not to subvert it when ascertained." Texas v. United States, 292 U.S. 522, 534, 54 S.Ct. 819, 825, 78 L.Ed. 1402 (1934). For reasons to which we later advert, it is apparent that Congress intended the general words defining an "enterprise" in § 1961(4) to go beyond the specific reference to private business or labor organizations.
 
 
 25
 As we read the Organized Crime Control Act, Congress was not so much concerned with limiting the protective and remedial features of the Act to business and labor organizations as it was with reducing the insidious capabilities of persons in organized crime to infiltrate the American economy. This accounts for the new civil remedies in the Act which permit equitable restraint of economic activity engaged in by organized crime as a substitute for criminal prosecution with its attendant procedural and constitutional protection for defendants. See Note, Infiltration of Legitimate Business,124 U.Pa.L.Rev. 192, 196 (1975). In other words, Congress' concern was enlarging the number of tools with which to attack the invasion of the economic life of the country by the cancerous influences of racketeering activity;[13] Congress did not confine its scrutiny to special areas of economic activity. Congress had no reason to adopt a constricted approach to the solution of the problem. Congress was concerned with the infiltration of organized crime into the American economy and to the devastating effects that racketeering activity had upon it.[14] Yet, we are asked to believe that Congress' approach to a monumental problem besetting the country was myopic and artificially contained. Is it conceivable that in considering the ever more widespread tentacles of organized crime in the nation's economic life, Congress intended to ignore an important aspect of the economy because it was state operated and state controlled? We think not. Congress declared that the provisions of Title IX "be liberally construed to effectuate its remedial purposes." 84 Stat. 947.
 
 
 26
 In its statement of the broad purposes of the Act, Congress evinced no reason why governmental agencies which had been infiltrated by organized crime should be immune from the reach of the Act. In fact, in Pennsylvania the Commonwealth is engaged in several of the largest and more affluent business operations in the state, each of which involve many millions of dollars. The Commonwealth of Pennsylvania purchases, distributes, and sells alcoholic beverages legally consumed among its more than 12,000,000 citizens;[15] it sells and distributes games of chance through its much touted lottery system.[16] The constricted reading of the statute advocated by the appellants makes little sense; private business organizations legitimately owned and operated by the states, even though their activities substantially affect interstate commerce, would be open game for racketeers. We refuse to believe that Congress had such "tunnel-vision" when it enacted the racketeering statute or that it intended to exclude from the protective embrace of this broad statute, designed to curb organized crime, state operated commercial ventures engaged in interstate commerce, or other governmental agencies regulating commercial and utility operations affecting interstate commerce.[17]
 
 
 27
 We also find support for our view in the congressional findings underpinning the legislation. Although Congress does refer in one of its findings to the increasing use of money and power to infiltrate and corrupt legitimate business and labor unions, its findings also note concern for all of "America's economy" from which organized crime in "highly sophisticated, diversified, and widespread activity" annually drains billions of dollars and weakens "the stability of the nation's economic system." These findings sensibly dwell upon the total American economy, not segments of it. Furthermore, the House Report on section 1962 observes that through three subsections it establishes "a threefold prohibition aimed at stopping the infiltration of racketeers into legitimate organizations." House Report No. 1549, 91st Cong.2d Sess. 39 (1970), U.S.Code Cong. & Admin.News, 1970, p. 4033. The report addresses not only private business organizations and unions, but speaks to legitimate organizations[18] as a class. We therefore hold that a state agency charged with the responsibility of enforcing the tax laws on an interstate industry engaged in importing cigarettes from points outside the state is an enterprise within the meaning of 18 U.S.C. § 1961(4).
 
 IV.
 
 28
 We have carefully reviewed each of the other contentions made by appellants and find them without merit.[19]
 
 
 29
 The judgments of the district court will be affirmed.
 
 
 30
 ALDISERT, Circuit Judge, dissenting.
 
 
 31
 I would reverse the judgments of conviction on Counts 1 and 2 of the indictment for two separate reasons, both predicated on the circumstance that appellants were first tried and acquitted in Pennsylvania state courts for the very same activity for which they were subsequently indicted and convicted in the federal district court. Accordingly, I disagree with the conclusions reached by the district court and dissent from the majority's affirmance.
 
 
 32
 My starting point is a recognition that the doctrine of stare decisis commands that an inferior court in the judicial hierarchy is bound by decisions of its higher courts. Therefore, for the purposes of this case, I assume the continued viability of Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959), which held that federal prosecutions based on the same acts as were prior state convictions did not place petitioners twice in jeopardy contrary to the Fifth Amendment. I make this assumption grudgingly, for I am of the view that Abbate was wrongly decided in 1959. The majority opinion never came to grips with Justice Black's analysis in dissent, joined by Chief Justice Warren and Justice Douglas, and no developing doctrine in the intervening eighteen years has persuaded me to alter my original views.
 
 I.
 
 33
 When it was announced, I believed that the majority opinion in Abbate ran counter to the conceptual underpinnings of the Double Jeopardy Clause. No subsequent Supreme Court decision has caused me to waver from this strong conviction. On the contrary, two lines of cases handed down since Abbate suggest that if presented with the issue anew, the Supreme Court would not continue to adhere unswervingly to either Abbate or Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), a case decided on the same day as Abbate, approving Abbate's factual converse (state conviction after federal prosecution).A.
 
 
 34
 A recent line of decisions has added formidable strength and sinew to the Double Jeopardy Clause, so eloquently described in Justice Black's dissents in Abbate and Bartkus.[1] In the Supreme Court term just concluded eighteen years after Abbate and Bartkus the Court appears to have perceived broad dimensions in the Double Jeopardy Clause closely resembling those identified in the earlier characterizations by Justice Black. Thus, Abney v. United States, 431 U.S. 651, 661, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), made clear that the clause protects an individual against more than being subjected to double punishments; it is a guarantee against being twice put to trial for the same offense. A few days later, Brown v. Ohio, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), reaffirmed the rule that one convicted of a greater offense may not be subjected to a second prosecution on a lesser included offense, since that would be the equivalent of two trials for "the same offense". On the same day, in Jeffers v. United States, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), a plurality announced fealty to the converse: "Because two offenses are 'the same' for double jeopardy purposes unless each requires proof of an additional fact that the other does not, it follows that the sequence of the two trials for the greater and lesser offenses is immaterial . . . ." At 151, 97 S.Ct. at 2216.
 
 
 35
 What the Court said in support of these decisions, in my view, is as significant as the precise holdings. Thus, speaking for the Court in Abney, Chief Justice Burger observed:
 
 
 36
 (T)his Court has long recognized that the Double Jeopardy Clause protects an individual against more than being subjected to double punishments. It is a guarantee against being twice put to trial for the same offense.
 
 
 37
 " 'The Constitution of the United States, in the Fifth Amendment, declares, " nor shall any person be subject (for the same offense) to be twice put in jeopardy of life or limb." The prohibition is not against being twice punished, but against being twice put in jeopardy . . . .'. . . The 'twice put in jeopardy' language of the Constitution thus relates to a potential, i. e., the risk that an accused for a second time will be convicted of the 'same offense' for which he was initially tried." Price v. Georgia, 398 U.S. 323, 326 (90 S.Ct. 1757, 1759, 26 L.Ed.2d 300) (1970).
 
 
 38
 See also United States v. Jorn, 400 U.S. 470, 479 (91 S.Ct. 547, 554, 27 L.Ed.2d 543) (1971); Green v. United States, 355 U.S. 184, 187-188 (78 S.Ct. 221, 223, 2 L.Ed.2d 199) (1957); United States v. Ball, 163 U.S. 622, 669 (16 S.Ct. 1192, 1194, 41 L.Ed. 300) (1896). Because of this focus on the "risk" of conviction, the guarantee against double jeopardy assures an individual that, among other things, he will not be forced, with certain exceptions, to endure the personal strain, public embarrassment, and expense of a criminal trial more than once for the same offense. It thus protects interests wholly unrelated to the propriety of any subsequent conviction. Justice Black aptly described the purpose of the clause:
 
 
 39
 "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." Green, supra, 355 U.S. at 187-88 (78 S.Ct. 221, 223).
 
 
 40
 Accord, Breed v. Jones, 421 U.S. 519, 528-530 (95 S.Ct. 1779, 1785-1786, 44 L.Ed.2d 346) (1975); Serfass v. United States, 420 U.S. 377, 387-388 (95 S.Ct. 1055, 43 L.Ed.2d 265) (1975); Jorn, supra, 400 U.S. at 479 (91 S.Ct. 547).
 
 
 41
 431 U.S. at 661, 97 S.Ct. at 2041.
 
 
 42
 In a similar vein, Justice Powell stated in Brown:
 
 
 43
 It has long been understood that separate statutory crimes need not be identical either in constituent elements or in actual proof in order to be the same within the meaning of the constitutional prohibition. . . .
 
 
 44
 The Double Jeopardy Clause "protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717 (89 S.Ct. 2072, 2076, 23 L.Ed.2d 656) (1969). . . . Where successive prosecutions are at stake, the guarantee serves "a constitutional policy of finality for the defendant's benefit." United States v. Jorn, 400 U.S. 470, 479 (91 S.Ct. 547, 554, 27 L.Ed.2d 543) (1971) (plurality opinion). That policy protects the accused from attempts to relitigate the facts underlying a prior acquittal, see Ashe v. Swenson, 397 U.S. 436 (90 S.Ct. 1189, 25 L.Ed.2d 469) (1970); cf. United States v. Martin Linen Supply Co., 430 U.S. 564 (97 S.Ct. 1349, 51 L.Ed.2d 642) (1977), and from attempts to secure additional punishment after a prior conviction and sentence, see Green v. United States, 355 U.S. 184, 187-188 (78 S.Ct. 221, 223, 2 L.Ed.2d 199) (1957); cf. North Carolina v. Pearce, supra.
 
 
 45
 The established test for determining whether two offenses are sufficiently distinguishable to permit the imposition of cumulative punishment was stated in Blockburger v. United States, 284 U.S. 299, 304 (52 S.Ct. 180, 182, 76 L.Ed. 306) (1932):
 
 
 46
 "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . ."
 
 
 47
 This test emphasizes the elements of the two crimes. "If each requires proof that the other does not, the Blockburger test would be satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes. . . ." Iannelli v. United States, 420 U.S. 770, 785 n. 17 (95 S.Ct. 1284, 1294, 43 L.Ed.2d 616) (1975).
 
 
 48
 432 U.S. at 164, 97 S.Ct. at 2224.
 
 
 49
 I am quick to acknowledge that these cases did not address the specific Abbate issue; nevertheless, they did discuss in great detail its constitutional underpinnings. Thus, it is my thesis that the rationes decidendi for the June 1977 cases added a force and vigor to the Double Jeopardy Clause not accorded in the Abbate decision of 1959. Indeed, the language of the recent Court opinions sounds the precise themes of the Abbate and Bartkus[2] dissents.
 
 B.
 
 50
 Closely related to the 1977 decisions were two significant cases from the 1969 Term: Waller v. Florida, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970), and Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). These cases bear closer resemblance to the problem presented here. Waller demonstrated that the rules of Abbate and Bartkus do not apply when the successive prosecutions are brought first by a city and later by a state, and that the second prosecution is barred. Ashe presented the question whether a state could charge a defendant with six separate offenses for the robbery of six poker players. The Court dissected the conceptual basis of double jeopardy, identified collateral estoppel as "an extremely important principle in our adversary system of justice", 397 U.S. at 443, 90 S.Ct. at 1194, and then posed the controlling issue of the case: "It is not whether (the petitioner) could have received a total of six punishments if he had been convicted in a single trial of robbing the six victims. It is simply whether, after a jury determined by its verdict that the petitioner was not one of the robbers, the state could constitutionally hale him before a new jury to litigate that issue again." Id. at 446, 90 S.Ct. at 1195. Concurring in Ashe, Justice Brennan, author of the 1959 Bartkus majority opinion, sounded perhaps the loudest voice in support of the Double Jeopardy Clause:
 
 
 51
 The Double Jeopardy Clause is a guarantee "that the State will all its resources and power (shall) not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity . . . ." Green v. United States, 355 U.S. 184, 187 (78 S.Ct. 221, 223, 2 L.Ed.2d 199) (1957). This guarantee is expressed as a prohibition against multiple prosecutions for the "same offence."
 
 
 52
 In my view, the Double Jeopardy Clause requires the prosecution, except in most limited circumstances, to join at one trial all the charges against a defendant that grow out of a single criminal act, occurrence, episode, or transaction. This "same transaction" test of "same offence" not only enforces the ancient prohibition against vexatious multiple prosecutions embodied in the Double Jeopardy Clause, but responds as well to the increasingly widespread recognition that the consolidation in one lawsuit of all issues arising out of a single transaction or occurrence best promotes justice, economy, and convenience. Modern rules of criminal and civil procedure reflect this recognition. See United Mine Workers v. Gibbs, 383 U.S. 715, 724-726 (86 S.Ct. 1130, 1137-1139, 16 L.Ed.2d 218) (1966).
 
 
 53
 397 U.S. at 450, 453-54, 90 S.Ct. at 1197 (Brennan, J., concurring)[3] (footnotes omitted).
 
 
 54
 The Ashe Court's recognition of the principle which forbids a state to relitigate an issue of ultimate fact once it has been "determined by a valid and final judgment," 397 U.S. at 443, 90 S.Ct. at 1194, is of special relevance in the present case. To understand why, we may return momentarily to Abbate. In Abbate, an express federal statute made it illegal to conspire to destroy telephone facilities which were essential parts of communications systems operated and controlled by the federal government. See 18 U.S.C. §§ 371, 1362. This was an offense distinct from the state crime of conspiracy to injure and destroy the property of another. The Court recognized as much in its reasoning that defendants' actions had "impinge(d) more seriously on a federal interest than on a state interest." 359 U.S. at 195, 79 S.Ct. at 671. In the case before us, however, there is no separate federal statute designed to protect a federal interest. Instead, the federal statute simply assimilates the state offense by definition. Because of this assimilation, the issue presented for decision can be expressed by paraphrasing Ashe : "It is simply whether, after a jury determined by its verdict that the (appellants had not committed state bribery), the (federal government) could constitutionally hale (them) before a new jury to litigate that issue again."
 
 
 55
 I suggest that given the opportunity of deciding the issue in this light, the Supreme Court perforce would be required to re-examine the continued vitality of Abbate.
 
 II.
 
 56
 To reverse the convictions, it is not necessary to mount a frontal assault on the Abbate citadel. It is sufficient to demonstrate that the government failed to prove essential ingredients required by the federal statutes under which the prosecution was brought. An alternative ground for reversal is to suggest that the Abbate rule, by its terms, did not involve crimes designed to protect only the state from victimization, or designed to vindicate only a state interest, as distinguished from a federal interest. Both approaches flow from the same factual and statutory framework.
 
 A.
 
 57
 As both the district court and the majority properly observe, the appellants were tried and acquitted in the Pennsylvania state court system on charges of bribery, extortion and conspiracy to accept bribes and avoid payment of the Pennsylvania cigarette tax. The state indictment was based on the same alleged activity as the subsequent federal indictment, which charged that the appellants violated 18 U.S.C. § 1962(c) by conducting and conspiring to conduct "a pattern of racketeering activity", an activity defined in 18 U.S.C. § 1961, in relevant part, as "any act or threat involving . . . bribery . . . which is chargeable under State law and punishable by imprisonment for more than one year." (Emphasis added).
 
 
 58
 It is conceded that bribery of a state official and avoiding payment of Pennsylvania cigarette taxes are not discrete offenses under federal criminal statutes. It is equally clear to me that at the time of the federal indictment, appellants' activities were neither "chargeable" nor "punishable" under state law. Appellants had, in fact, been "charged" with the alleged crimes, but once they were acquitted, by any reading of the cases involving the Double Jeopardy Clause they could not again be "chargeable under State law." Moreover, they could not have been punished "by imprisonment for more than one year" under state law without being convicted and they could not have been convicted because they had already been acquitted! Therefore, since the federal definitional statute requires that the racketeering offense be both chargeable and punishable under state law, the government could not, and did not, prove all the elements necessary under the federal statute. It was a simple case of legal impossibility of performance the appellants had been acquitted in the state courts of the very acts alleged to form the basis of the federal indictment.
 
 
 59
 United States v. Berrigan, 482 F.2d 171 (3d Cir. 1973), provides guidance in such a situation:
 
 
 60
 (W)e (must) distinguish between the federal system, where criminal law is solely statutory, and jurisdiction patterned upon the common law. "It is commonplace that federal courts are courts of limited jurisdiction, and that there are no common law offenses against the United States. 'The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the Court that should have jurisdiction of the offense.' . . . 'It is axiomatic that statutes creating and defining crimes cannot be extended by intendment, and that no act, however wrongful, can be punished under such a statute unless clearly within its terms.' " . . . We distinguish between the defense of factual impossibility, which is not involved here, and legal impossibility, which is.
 
 
 61
 482 F.2d at 190 (footnotes omitted).
 
 
 62
 Thus, I would reverse on the theory that the government failed to prove essential elements of the federal offense, to-wit, that the appellants were "chargeable" or "punishable" under state law.
 
 B.
 
 63
 An alternative ground for reversal is to demonstrate that the Abbate rule is given vigor only when the subsequent federal trial is based on a federal statute protecting a federal interest distinct from the state interest, see Abbate, supra, 359 U.S. at 194-95 (majority), 201, 79 S.Ct. 666 (Brennan, J.); that it does not apply when the primary interest to be vindicated and protected is an interest of the state, whether viewed variously from the perspectives of individual interests, public interests, or social interests.[4] At the heart of both prosecutions, state and federal, were activities designed to protect the interest of the Commonwealth of Pennsylvania in collecting the Pennsylvania cigarette tax and its interest in general morals, specifically, an interest that Pennsylvania officers not be bribed. Pennsylvania's interest may be described, in the Roscoe Pound formulation, as the social interest in the general morals, the interest to be secure against acts or courses of conduct offensive to the moral sentiments of Pennsylvanians.
 
 
 64
 The federal criminal statutes do not contain provisions explicitly declaring as anti-social or offensive any behavior to cheat Pennsylvania of its cigarette tax or to bribe a Pennsylvania official. It was the General Assembly of Pennsylvania, not the Congress of the United States, that outlawed these acts. The Pennsylvania statutes vindicated an interest recognized in Roman law as the protection of boni mores, reflected by policies against dishonesty, corruption, gambling, and things of immoral tendency. Although Congress has ranged far and wide in enacting much legislation protecting boni mores of its citizens, it has not legislated in ipsis verbis to protect a state's interest in collecting a state cigarette tax or prohibiting bribery of state officials.
 
 C.
 
 65
 Thus, I reach the same result even if I assume the continued viability of the Abbate rule, a rule in the sense of a detailed legal consequence following a detailed set of facts. In Abbate, there were two specific statutes one, a state law precluding conspiracies to destroy property of others and the other, a separate federal law prohibiting a conspiracy to destroy communication systems operated and controlled by the federal government. The federal statute was designed to vindicate a distinct, named federal interest. Thus the justification offered in Abbate adopted the rationale stated by Chief Justice Taft in United States v. Lanza, 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314: "(A)n act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each."
 
 
 66
 An offense against the national sovereign, therefore, of necessity trenches upon some defined federal interest. I cannot accept the notion that any federal interest remains to be vindicated in a case such as the present, where the federal statute provides that a federal crime occurs only upon proof of the commission of a state crime, and a previous state court has ruled that there has been no state crime. By definition, the federal interest at stake here can rise no higher than the state interest. If the state interest has received total vindication through the state court systems, no interest state or federal remains for the federal courts to vindicate. Nor is there any authority suggesting that one separate sovereign may seek to vindicate the interest of another sovereign after the courts of that other sovereign have vindicated that interest. To so suggest is to indulge in political science fiction.
 
 
 67
 That the Congress has legislated against a crime called "racketeering", which assimilates the state law, makes no difference in the context presented here. I do not contest the authority of Congress to so legislate or the constitutionality of the federal statutes so enacted. I only question the existence of any remaining federal interest in the context of the Double Jeopardy Clause once the state courts have acted on the very offense assimilated by Congress as a definition of the federal crime. If viewed from the analysis that the federal offense of "racketeering" is something separate, because it is an offense greater or lesser than the state offense under which the appellants were tried and convicted, then the rule of Brown v. Ohio, supra, should come into operation acquittal of a greater offense precludes later prosecution of a lesser offense, and vice versa. If viewed from the analysis that the federal offense is neither greater nor lesser than the state offense, yet nonetheless separate, then the rule of Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), reaffirmed in Brown v. Ohio, supra, comes into play: "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact that the other does not. . . ." 284 U.S. at 304, 52 S.Ct. at 182. Although the Blockburger rule is designed to prohibit the imposition of cumulative punishment, the same reasoning is demanded here.[5]
 
 
 68
 In sum, assuming the continued viability of Abbate, I suggest that its rule does not apply where (1) the act denounced as a crime is only an offense against the peace and dignity of a state, (2) the interest sought to be protected by the state law is exclusively a state interest and not an offense against individuals of the national sovereign or the national sovereign itself, and (3) the defendants have previously been indicted, tried, and acquitted of the precise state crime assimilated into the federal crime by definition.[6]
 
 III.
 
 69
 Accordingly, on the basis of the foregoing reasons, I would reverse the convictions on Counts 1 and 2 of the indictment. It would also follow that because evidence on these counts could have affected the jury's consideration on the income tax counts, United States v. De Cavalcante, 440 F.2d 1264 (3d Cir. 1971), I would order a new trial on those counts.
 
 
 
 [1]
 18 U.S.C. § 1962(c) and (d) provide:
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.
 
 
 [2]
 Sills was charged with conspiracy to violate section 1962(c) but not the substantive offense. Millhouse was charged with violating both the conspiracy provisions of 1962(d) and the substantive offense described in 1962(c). Both defendants were also charged in two counts each with filing false income tax returns
 
 
 [3]
 Although their convictions on income tax counts are not directly attacked by the appellants, they argue that a new trial also is required on the income tax counts because of the improper and prejudicial introduction of evidence on the other counts. United States v. DeCavalcante, 440 F.2d 1264, 1276 (3d Cir. 1971)
 
 
 [4]
 In Millhouse's case, the charging papers alleged that Millhouse did "during the period August 6, 1971, to March 1972 being at the time an officer of the Commonwealth, to wit, Supervisor, Region # 2, Bureau of Cigarette and Beverage Taxes, take a reward or fee from Harold J. Sharp by color of his office, said fee or reward not being allowed by law."
 
 
 [5]
 The double jeopardy clause of the fifth amendment provides:
 (N)or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . .
 
 
 [6]
 Although the appellants have each filed separate briefs, we consider their contentions jointly except where otherwise indicated
 
 
 [7]
 On the day the United States Supreme Court decided Abbate, supra, it also decided Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1958), in which it held that a state prosecution for violation of its penal law against bank robbery was not barred under the due process clause of the fourteenth amendment because of a prior acquittal for a federal offense on substantially the same evidence
 
 
 [8]
 Mason has been cited rarely in its 68-year history and appellants cite no case adopting their interpretation
 8A In arguing that the acts of these defendants were not "chargeable under State law and punishable by imprisonment for more than one year" since both defendants had been acquitted in state court, the dissent misconstrues this definitional purpose. Section 1961 requires, in our view, only that the conduct on which the federal charge is based be typical of the serious crime dealt with by the state statute, not that the particular defendant be "chargeable under State law" at the time of the federal indictment.
 
 
 [9]
 A historical analysis of the genesis of the dual sovereignty doctrine and the culmination of its development are found in Abbate v. United States, 359 U.S. at 190-94, 79 S.Ct. 666. Also quoted in that analysis is a succinct statement of the doctrine expressed by Chief Justice Taft writing for a unanimous court in United States v. Lanza, 260 U.S. at 382, 43 S.Ct. at 142:
 We have here two sovereignties, deriving power from different sources, capable of dealing with the same subject-matter within the same territory. . . . Each government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other.
 It follows that an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each. The Fifth Amendment, like all the other guaranties in the first eight amendments, applies only to proceedings by the Federal Government, . . . and the double jeopardy therein forbidden is a second prosecution under authority of the Federal Government after a first trial for the same offense under the same authority.
 
 
 [10]
 See, e. g., United States v. Villano, 529 F.2d 1046, 1060-61 (10th Cir. 1976); United States v. Johnson, 516 F.2d 209 (8th Cir.), cert. denied, 423 U.S. 859, 96 S.Ct. 112, 46 L.Ed.2d 85 (1975); United States v. Vaughan, 491 F.2d 1096, 1097 (5th Cir. 1974); United States v. Jackson, 470 F.2d 684 (5th Cir.), cert. denied, 412 U.S. 951, 93 S.Ct. 3019, 37 L.Ed.2d 1004 (1972); United States v. Barone, 467 F.2d 247, 250 (2nd Cir. 1972); United States v. Hutul, 416 F.2d 607, 626 n. 35 (7th Cir.), cert. denied, 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970)
 
 
 [11]
 The appellants' contentions depend upon their acquittal rather than their conviction in the state court and it might be argued that they actually are raising a collateral estoppel claim. As the appellants concede in the briefs in this court, the dual sovereignty doctrine applies to successive federal and state violations of separate and distinct federal statutes. "It never required identity of prosecuting parties as does the doctrine of collateral estoppel." Millhouse brief, p. 20, United States v. Johnson, 516 F.2d 209, 211-12 (8th Cir.), cert. denied, 423 U.S. 859, 96 S.Ct. 112, 46 L.Ed.2d 85 (1975); Ferina v. United States, 340 F.2d 837-39 (8th Cir.), cert. denied, 381 U.S. 902, 85 S.Ct. 1446, 14 L.Ed.2d 284 (1965)
 
 
 [12]
 The pertinent provisions of 18 U.S.C. § 1964 provide:
 (a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.
 (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fees.
 
 
 [13]
 Congress stated that the purpose of the Act is "to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process by establishing penal prohibitions and by providing sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." 84 Stat. 923
 
 
 [14]
 A recent report of the Advisory Commission on Intergovernmental Relations describes the pattern of cigarette bootlegging that has been developing for the past decade and the link between bootlegging and organized criminal elements. The Commission states inter alia :
 "In (about a dozen states mainly in the East and Midwest) cigarette smuggling is a multi-million dollar business, organized crime syndicates are heavily involved, and there are many victims. State and local governments lose millions of dollars; taxpayers pay higher taxes or receive fewer services; cigarette wholesalers and retailers are driven out of business and jobs are lost; political and law enforcement officials are corrupted; trucks are hijacked and warehouses raided; and people are injured and even killed."
 "The profits from organized smuggling of cigarettes are enormous. The Council Against Cigarette Bootlegging estimates that the illegal profits in eight eastern states were about $97.9 million in fiscal year 1975-76. The profits from cigarette smuggling are used by organized crime to finance other illegal operations, such as drugs, loan sharking, and gambling. These profits are earned at the expense of State and local governments, which, according to the Council, lost an estimated $170.7 million in revenues in the eight eastern States (Connecticut, Delaware, Maryland, Massachusetts, New York, New Jersey, Pennsylvania, and Rhode Island), and the tobacco industry (wholesalers and retailers), which lost an estimated $470 million in sales."
 (Footnote omitted.)
 Advisory Commission on Intergovernmental Relations, Cigarette Bootlegging: A State and Federal Responsibility 20-20 (1977).
 
 
 [15]
 The Commonwealth of Pennsylvania operated 752 retail liquor stores from July 1, 1970 to June 29, 1971, inclusive and the store sales for that period amounted to $474,010,000; it operated 757 stores from June 30, 1971 to June 27, 1972, inclusive and the store sales for that period amounted to $496,590,000. Table 40, Pennsylvania Statistical Abstract 1976, 18th ed
 
 
 [16]
 The Commonwealth of Pennsylvania commenced its lottery operations in 1972. For its first fiscal year ending June 30, 1972, it generated ticket sales amounting to $50,452,000. For its fiscal year ending June 30, 1973, its lottery ticket sales amounted to $118,801,000. Table 167, Pennsylvania Statistical Abstract 1976, 18th ed
 
 
 [17]
 Most courts that have construed section 1962 have taken a broad and expansive view of the statute. United States v. Altese, 542 F.2d 104 (2d Cir. 1976) (applied to illegal activities); United States v. Morris, 532 F.2d 436 (5th Cir. 1976); United States v. Cappetto, 502 F.2d 1351 (7th Cir.), cert. denied, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975) (applied to illegal activities); United States v. Parness, 503 F.2d 430 (2d Cir.), cert. denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975) (statute applied to foreign corporations) (applied to enterprise though its activities may not be legitimate)
 
 
 [18]
 Senator McClelland also provided a synopsis of the bill during the debates in which he also pointed out that title IX "(p)rohibits infiltration of legitimate organizations by racketeers . . . where interstate commerce is affected." 116 Cong.Rec. 585 (1970) (emphasis supplied)
 
 
 [19]
 Appellants contend that the district court also erred in the following respects: (1) admitting evidence that appellants received other unrelated bribes; (2) admitting evidence of the witness Leroy Wade over objection that Millhouse told him that co-defendant John R. Sills told him that the chairman (of the City Democratic Committee) said they had better get out of the cigarette business; (3) in denying appellants' motion for a mistrial based on the fear expressed by some of the jurors that co-defendant Rocco Frumento was staring at them
 Sills separately contends in addition that the district court erred: (1) in not granting him a severance where his two co-defendants were his chief witnesses and where there was an obvious gross disparity in the quantum of evidence to be produced and where evidence of criminal acts similar in nature were unrelated to the offenses charged was being introduced against the two co-defendants; (2) in repeatedly referring to Sills as a co-conspirator and repeatedly referring to statements admitted into evidence against him as statements of a co-conspirator made in furtherance of the conspiracy; (3) in denying Sills' motion for a new trial based on the prosecuting attorney's deliberate deception in his closing argument.
 Finally, Millhouse separately contends that the prosecuting attorney's closing argument improperly called upon the jury to make an inference against him because he did not take the stand and explain the evidence against him.
 
 
 [1]
 In Bartkus, Justice Black wrote:
 Fear and abhorrence of governmental power to try people twice for the same conduct is one of the oldest ideas found in western civilization. Its roots run deep into Greek and Roman times. Even in the Dark Ages, when so many other principles of justice were lost, the idea that one trial and one punishment were enough remained alive through the canon law and the teachings of the early Christian writers. By the thirteenth century it seems to have been firmly established in England, where it came to be considered as a "universal maxim of the common law." It is not surprising therefore, that the principle was brought to this country by the earliest settlers as part of their heritage of freedom, and that it has been recognized here as fundamental again and again. Today it is found, in varying forms, not only in the Federal Constitution, but in the jurisprudence or constitutions of every State, as well as most foreign nations. It has, in fact, been described as a part of all advanced systems of law and as one of those universal principles "of reason, justice, and conscience, of which Cicero said: 'Nor is it one thing at Rome and another at Athens, one now and another in the future, but among all nations it is the same.' " While some writers have explained the opposition to double prosecutions by emphasizing the injustice inherent in two punishments for the same act, and others have stressed the dangers to the innocent from allowing the full power of the state to be brought against them in two trials, the basic and recurring theme has always simply been that it is wrong for a man to "be brought into Danger for the same Offence more than once." Few principles have been more deeply "rooted in the traditions and conscience of our people."
 The Court apparently takes the position that a second trial for the same act is somehow less offensive if one of the trials is conducted by the Federal Government and the other by a State. Looked at from the standpoint of the individual who is being prosecuted, this notion is too subtle for me to grasp. If double punishment is what is feared, it hurts no less for two "Sovereigns" to inflict it than for one. If danger to the innocent is emphasized, that danger is surely no less when the power of State and Federal Governments is brought to bear on one man in two trials, than when one of these "Sovereigns" proceeds alone. In each case, inescapably, a man is forced to face danger twice for the same conduct.
 359 U.S. at 151-56, 79 S.Ct. at 696 (Black, J., dissenting) (footnotes omitted).
 
 
 [2]
 I note that in Smith v. United States, 423 U.S. 1303, 96 S.Ct. 2, 46 L.Ed.2d 9 (1975), Justice Douglas forecasted the possible demise of Bartkus. In that case, the Justice granted a stay of a district court's order that the files and records from the federal grand jury which indicted the applicants be turned over to a state prosecutor contemplating state prosecution. The applicants had pleaded nolo contendere to federal charges. Noting that the Double Jeopardy Clause might preclude state prosecution, Justice Douglas wrote:
 That kind of objection may, in time, be resolved upon an appropriate motion before state tribunals. I mention the matter because the Double Jeopardy Clause of the Fifth Amendment was held applicable to the states in Benton v. Maryland, 395 U.S. 784 (89 S.Ct. 2056, 23 L.Ed.2d 707) (1969). Benton may cast doubt upon the continuing vitality of Bartkus v. Illinois . . . . See also Abbate v. United States . . . .
 423 U.S. at 1307, 96 S.Ct. at 4.
 
 
 [3]
 Justice Brennan clings unerringly to these views. See Thompson v. Oklahoma, 429 U.S. 1053, 97 S.Ct. 768, 50 L.Ed.2d 770 (1977), in which, dissenting from a denial of certiorari, he wrote:
 I would grant the petition for certiorari and reverse the judgment of the Court of Criminal Appeals affirming the burglary and firearm convictions. I adhere to the view that the Double Jeopardy Clause of the Fifth Amendment, applied to the States through the Fourteenth Amendment, requires the prosecution in one proceeding, except in extremely limited circumstances not present here, of "all the charges against a defendant that grow out of a single criminal act, occurrence, episode, or transaction." Ashe v. Swenson, 397 U.S. 436, 453-454 (90 S.Ct. 1189, 25 L.Ed.2d 469) (1970) (Brennan, J., concurring).
 The dissent contains a lengthy compendium of the Justice's similar dissents and concurrences. Id.
 
 
 [4]
 Here I use the trichotomy originally suggested by Jhering and popularized by Roscoe Pound:
 (I)ndividual interests are claims or demands or desires involved immediately in the individual life and asserted in title of that life. Public interests are claims or demands or desires involved in life in a politically organized society and asserted in title of that organization. They are commonly treated as the claims of a politically organized society thought of as a legal entity. Social interests are claims or demands or desires involved in social life in civilized society and asserted in title of that life.
 Pound, A Survey of Social Interests, 57 Harv.L.Rev. 1, 1-2 (1943).
 
 
 [5]
 In Brown, supra, Justice Powell stated:
 If two offenses are the same under this (Blockburger ) test for purposes of barring consecutive sentences at a single trial, they necessarily will be the same for purposes of barring successive prosecutions. See In re Nielsen, 131 U.S. 176, 187-188 (9 S.Ct. 672, 675-676, 33 L.Ed. 118) (1889); cf. Gavieres v. United States, 220 U.S. 338 (31 S.Ct. 421, 55 L.Ed. 489) (1911). Where the judge is forbidden to impose cumulative punishment for two crimes at the end of a single proceeding, the prosecutor is forbidden to strive for the same result in successive proceedings. Unless "each statute requires proof of an additional fact which the other does not," Morey v. Commonwealth, 108 Mass. 433, 434 (1871), the Double Jeopardy Clause prohibits successive prosecutions as well as cumulative punishment.
 432 U.S. at 166, 97 S.Ct. at 2225.
 
 
 [6]
 I am impressed by what was said in United States v. Mason, 213 U.S. 115, 125, 29 S.Ct. 480, 483, 53 L.Ed. 725 (1909):
 As a general rule, the Federal courts accept the judgment of the state court as to the meaning and scope of a state enactment, whether civil or criminal. Much more should the Federal court accept the judgment of a state court based upon a verdict of acquittal of a crime against the State, whenever, in a case in the Federal court, it becomes material to inquire whether that particular crime against the State was committed by the defendants on trial in the Federal court for an offense against the United States.